[No. 2840. June 30, 1924. Rehearing Denied Feb. 27, 1925.]

## STATE v. JACKSON·

### SYLLABUS BY THE COURT

1.   Evidence reviewed, and HELD sufficient to sustain a verdict of murder in the second degree.

2.   If it is shown that the accused has had an opportunity to cross-examine a witness at a preliminary hearing, the testimony of such witness may be read at the trial upon it being satisfactorily shown to the court that the witness is dead, insane, or cannot with due diligence be found within the state.   The admission of such testimony is not in conflict with a constitutional guaranty that the accused "shall have the right" to be confronted by the witnesses testifying against him.

3.   Evidence offered as foundation for admission of testimony of witness given at the preliminary hearing considered and deemed sufficient.   Further HELD, that whether or not a satisfactory showing has been made is a matter within the discretion of the trial court, and this court will not interfere with the trial court's exercise of discretion provided it is not abused.   Identity of cause in which witness testified at preliminary hearing HELD sufficiently shown to warrant admission at trial.

4.   Assignment that there was not due process of law, because record does not disclose verdict of the jury, will not be considered where the record shows final judgment and sentence.

5.   Under the circumstances disclosed in the evidence, it was not error to permit a witness to testify that a gun would or would not make an imprint if it had·fallen a distance of 12 inches.

6.   Objections to testimony of accused as to a conversation alleged to have been had with a codefendant properly sustained.

7.   Not error to refuse requested instructions not applicable to issues raised by the testimony.

8.   Under evidence adduced, HELD sentence of 90 to 99 years not excessive.

Appeal from District Court, Quay County; Leib, Judge.

Orin B. Jackson was convicted of murder in the second degree, and he appeals· Affirmed.

Renehan & Gillbert, of Santa Fe, for appellant.

M. J. Helmick, Atty. Gen., and J. W. Armstrong, Asst. Atty· Gen., for the State.

### OPINION OF THE COURT

HATCH, District Judge. The appellant, Orin B. Jackson, and two codefendants. Brent Cosner and Jack Lewis, were indicted March 14, 1922, in Quay county, N. M., the indictment charging the defendants with the felonious killing of Royal W. Lackey. The defendants were jointly tried at the September, 1922, term of the district court of Quay county. Cosner and Lewis were acquitted. Jackson was convicted of murder in the second degree, and sentenced to a term in the penitentiary of not less than 90 nor more than 99 years. From the judgment and sentence of· the lower court, the defendant has appealed to this court.

[1] From the transcript the following facts appear:

On Saturday before the homicide, one W. K. Bell and Brent Cosner were at the Jackson camp in Quay county. After they had eaten supper the deceased, Roy Lackey, came to the camp. He ate supper, and they all went to bed about 8 o'clock, Bell and Lackey occupying the same bed and Cosner another. Later in the evening, about 10 o'clock, Jackson and Lewis arrived at the camp. They brought with them two guns, a Winchester and a shotgun· After their arrival at the camp there was some drinking, all men taking a few drinks.

The following morning all ate breakfast together, and Jackson, Lewis, and Lackey rode off toward the north abreast. This was Sunday morning. Shortly after they left the ranch, Jackson returned and procured some whisky.

The appellant and his brother owned the ranch where the killing occurred, Lackey, the deceased, had a homestead claim, and at the time was ranging about 150 head of cattle within the Jackson pasture.

It appears that one Dave or D. L. Snyder, on the morning of the homicide, left the Oden ranch where he was working, starting for Roy Lackey's place. About 9 o'clock he met Lewis and Cosner, who told him they would show him Lackey's home. They then rode north until they saw Jackson and Lackey. Just before the three men, Lewis, Cosner, and Snyder, met Lackey and Jackson they observed the two men pointing their pistols at them. They rode on until they came up with Jackson and Lackey, at which time Jack Lewis got down from his horse and took a bottle out of Jackson's pocket. Jackson then turned and drew his gun on Snyder, and, with offensive language, ordered him off his horse. He then made Snyder drink. Brent Cosner then introduced Snyder to Lackey and Jackson, and Snyder told them his business; that he was searching for a cow when he met Cosner and Lewis. Thereupon Jackson made him take another drink of whisky, and said that he (Snyder) had accused Roy Lackey of stealing his cow. Several things then occurred, Jackson drawing his gun again, and making Snyder drink; swearing him at one time not to tell his employer, Mr. Oden, what had happened, and a minute later making him swear he would tell what had happened. He (Jackson) waved his gun around in what appellant says was a playful manner, but in which we fail to see the humor. At one time he shot down at Snyder's feet and jerked him back and forth. Roy Lackey, the deceased, then told Jackson to put up his gun, and thereupon the appellant waved his gun around his head and told Lackey to stand back or he would kill him. Lackey stood still, but Brent Cosner stepped in front of Jackson and started to say something. Jackson struck Cosner across the chest with his gun. Cosner then knocked Jackson down and grabbed him by the wrists.

Jack Lewis jumped down from his horse and grabbed
Jackson's gun. Snyder reached for the reins of his
horse and Lackey gave him a nod to go on to his
(Lackey's) house. Snyder immediately mounted his
horse and rode away. A minute, or even less, after
Snyder left, he heard two shots coming from the di-
rection of the place where he had left the men· He
did not turn back, but continued on his way. This
was about 9:30 Sunday morning.

No one appears to have seen any of the men after
Snyder left them until about 11 o'clock in the morning,
when Brent Cosner returned to the camp. The witness
Bell testifies that Cosner came to the camp about 11
o'clock Sunday morning. Cosner did not remain at the
camp, but immediately remounted his horse and rode
away in a westerly direction. Later, Jack Lewis ar-
rived at the camp and inquired for Brent Cosner.
Upon ascertaining the direction Cosner had gone from
the camp, Lewis also rode away, going in the same
direction Cosner had gone. About 12 o'clock the
three men, Cosner, Lewis, and Jackson, came riding
back to the camp together from the north. When they
arrived at the camp, Jackson got off his horse and
walked to the barn, which was about 180 feet away.
Cosner and Lewis went in the house· Late in the
evening appellant came to the ranch house. He had
remained out of sight all day. When Jackson came
to the house he ate some tomatoes and then went out
to the well, where he sat on a piece of pipe sticking
out of the water trough, sitting in a stooped position
with his head down. While the appellant was sitting
at the well, the witness Bell went out and talked with
him, asking him where Roy (meaning the deceased,
Roy Lackey) was. Appellant replied that he had left
Roy driving a cow. This was about the entire con-
versation. This conversation is denied by the appel-
lant, but the jury evidently disregarded his story.

About dusk the three men, Jackson, Cosner, and
Lewis, left the camp, Jackson and Lewis driving in
one automobile and Cosner in another. Before leav-

ing the ranch, Brent Cosner told Bell to wait at the camp until he returned; that he would be back about 9 o'clock Monday morning, and for Bell to keep up a horse for him, and they would ride the pasture together. The evidence of Jackson shows that he went to the ranch in Texas, close to the town of Vega. When informed by his brother that the sheriff of Quay county was in Vega looking for him, he went to Vega and surrendered, returning to New Mexico without requisition. However, this was two or three days after the shooting, and none of the men reported the shooting to the officers.

The morning following, Bell waited for Cosner, but, Cosner, not coming back, he (Bell) rode away before Cosner returned. Bell had gone about 10 or 12 miles north of the camp when he discovered Roy Lackey's horse. The horse had his saddle and bridle on, the reins dropped on top of a bush. The witness testified that the horse was in bad condition, "drawed terrible bad, jaded, and gaunt." The condition of the ground about the horse was "tromped up some." The witness went south from the place where he found Lackey's horse and then west to the White place, where he met one Taylor Lytton. From there he went to Lackey's home. From Lackey's residence Bell was accompanied by Margaret Lackey, daughter of the deceased, and Joe Talmadge. The three of them rode back to the place where the horse was found and begain looking the country over for Roy Lackey. After the three had searched for some time without success, Margaret Lackey went for the officers, and Bell and Talmadge continued their search for the deceased.

The two men found the body of Roy Lackey about three-quarters of a mile from the place his horse was first seen. Lackey was lying with his head to the south, feet to the north, on his back, arms stretched out. The physician testified that he found the following wounds in the body of the deceased:

"A gunshot wound entering the left breast about an inch above the left nipple, very nearly on a line with the nipple, at an angle of about forty-five degrees, and coming out on the right side in front of the kidney, over the hip bone. * * * A deep cut wound began at the inner portion of the right eye and extending around to the outer portion, the eyeball being lifted completely out of the socket."

The doctor further testified that death was caused by the gunshot wound, and that it was such a wound as could not be self-inflicted.

The defendant testified in his own behalf, admitted the killing and claiming it was done in self-defense.

Many other facts were adduced at the trial. There was some evidence tending to show that the tracks of the horse ridden by Roy Lackey leading from the place where the body was found to the place where the horse was found were followed by small horse tracks. A pistol was found lying about six inches from the hand of the deceased. It was lying on top of grass and had made no impression in the earth.

1. We have made this statement in facts in view of appellant's first contention, which is that there is no evidence sufficient to sustain a verdict of murder in the second degree.

In connection with this contention, the appellant argues that the court erred in denying the motion for an instructed verdict both at the end of the state's case in chief and at the close of the trial. He argues that the evidence discloses friendship existing between Jackson and Lackey for a good many years and even on the morning of the homicide. Appellant also contends, in line with his first argument, that the facts as shown by the evidence are as consistent with innocence as with guilt, and therefore they are insufficient to sustain the verdict. We do not think it necessary to go into a discussion of the facts, it not being the province of this court to weigh the testimony adduced at the trial. In the case of State v. Cooley, 19 N. M. 91, 140 Pac. 1111, 52 L. R. A. (N. S.) 230, we find facts which are not nearly as strong as they are in

the instant case. In that case the verdict was of murder in the first degree. From the statement of facts it appeared that the appellant indulged in strong drink resulting in the killing of his bosom friend and cousin. In that case we find the following statement:

"If the killing is unlawful and voluntary, and without deliberate premeditation, the offense is murder in the second degree, malice being implied, unless the provocation was of such character as would reduce the crime to voluntary manslaughter, for which offense a drunken man is equally responsible as a sober one."

In the case of State v. Parks, 25 N. M. 395, 183 Pac. 433, it is said:

"There was evidence of the footprints of the appellants and of empty cartridges. * * * Killing with a deadly weapon was admitted; therefore malice was implied. It was for the jury to determine from all the evidence whether the killing occurred according to the theory of the state, or that of the appellants, or in some other manner. The case properly called for an instruction as to murder in the second degree."

From the foregoing authorities and from the facts proved, this court cannot say that the evidence was insufficient to warrant the verdict of murder in the second degree. The facts we have detailed; the quarrel at the place of the homicide, the threat of the appellant that he would kill the deceased if he did not stand back, the wanton disregard for human life as demonstrated in the acts of the appellant at the place of the homicide as detailed by the witness Snyder, the circumstances proved by the state, the leaving of the body, the driving away of the horse of the deceased, the return to the ranch and concealment, and the going into another jurisdiction, all tend to show premediated malice, and under circumstances showing a wicked and malignant heart. Remembering that the jury are the judges of the facts, and that they may believe or doubt all or parts of the evidence for the prosecution or for the defense, it can well be said in this case, after reviewing the entire record, that the appellant killed the deceased with premediated malice and without considerable provocation or without justi-

fication on the ground of self-defense· Therefore appellant's argument on both his first and second contentions must fail.

[2]   2.   Appellant contends that the evidence of the witness Snyder, given at the preliminary examination, was not admissible. From the record, it appears that Snyder appeared at the preliminary examination and testified; that he was sworn by John Grayson, justice of the peace; that his testimony was taken in shorthand by a stenographer, and later transcribed; that Snyder was fully cross-examined at said hearing by counsel for the defendant; and that the testimony he gave was material in the case. He did not appear at the trial, and the testimony he gave in the preliminary hearing was read by the stenographer.

Counsel for appellant contends that this proceeding violates the constitutional right of an accused to be confronted with the witnesses against him.   The state argues that the evidence is admissible by virtue of chapter 29, Session Laws of 1919, being "An act to provide for the taking of testimony out of court, by oral examination, and for the use of testimony taken at former trials." The state further argues that, notwithstanding this statute, the evidence is admissible under the common law.   Appellant takes the position that the statute in question applies only to civil cases.

Inasmuch as the appellant challenges the right to introduce this testimony and raises thereby a constitutional provision, the application of the statute of 1919 does not seem to us to be material, for if appellant's position is correct and he was deprived of a constitutional right, then the statute cannot aid the state, for it is obvious that if the constitutional provision is susceptible to the interpretation placed on it by the appellant, the statute could not be used as a means to deprive him of that constitutional right.   In short, if the statute gives the right to use the testimony of an absent witness, and if such testimony is inadmissible by virtue of the constitutional inhibition, then the rights given

by the statute fail. For this reason, we will not discuss the statute of 1919, but will confine ourselves to deciding the question as to whether appellant has been deprived of a constitutional right.

Our Constitution (article 2, § 14) contains the usual provision:

"In all criminal prosecutions, the accused shall have the right * * * to be confronted with the witnesses against him."

This right of confrontation has been said to be simply the right to meet the witness face to face. The right of the accused to meet a witness face to face is an important one, and is too grave to be brushed aside lightly. As has been said:

"It is next in importance and value to the right of trial by jury, and it would be fully conceded and secured to him according to the true intent and meaning of the Constitution."

Such being the case, we have carefully reviewed the authorities in an endeavor to arrive at the true intent and meaning of this constitutional provision. After careful consideration, we have come to the conclusion that the purpose of the constitutional provision is to secure to the defendant the opportunity of cross-examination. In this connection, Mr. Wigmore says:

"What was, in principle, the meaning and purpose of this confrontation? So far as there is a rule of confrontation what is the process that satisfies the rule? It is generally agreed that the process of confrontation has two purposes—the main and essential one, and a secondary one. The main and essential purpose of confrontation is to secure the opportunity of cross-examination. The opponent demands confrontation, not for the idle purpose of gazing upon a witness or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers. That this is the true and essential significance of confrontation is demonstrated by council and judges from the beginning of the hearsay rule to the present day."

Continuing, the writer then points out the secondary purpose, which is, he states, the advantage to be obtained from the personal appearance of the witness.

The opportunity, as it is otherwise stated, for the judge and jury to observe the demeanor of the witness while testifying. But that this is only an incident to the main right, and is not a right in itself, is ably pointed out by Wigmore, concerning which he says:

"In other words, this secondary advantage is a result accidentally associated with the process of confrontation, whose original and fundamental object is the opponent's cross-examination. The witness' presence before the tribunal may be dispensed with if not obtainable. The question, then, whether there is a right to be confronted with opposing witnesses, is essentially a question whether there is a right of cross-examination. If there has been cross-examination there has been confrontation. The satisfaction of the right to cross-examination disposes of any objection based on the so-called right of confrontation."

The writer continues his discussion of the principles ·involved in his characteristic thorough manner, but the length is such that the entire argument cannot be set forth herein. We refer to volume 2, §§ 1365-1418, inclusive, Wigmore, Cr. Ev. (10th Ed.)

The case of State v. King, 24 Utah, 482, 68 Pac. 418, 91 Am. St. Rep. 808, deals with the question exactly as it is presented in the instant case, except in that case the appellant sought to have the statute under which the testimony was admitted declared unconstitutional as conflicting with the Utah Constitution, which gave the accused the right to be confronted by the witnesses against him. In the opinion it is said:

" 'Under the Constitution and statutes of the state the accused had a right to be present at the trial, to be confronted by the witnesses against him, and to meet his accusers face to face. He also had the right to appear and defend' against the accusation preferred against him in person and by counsel. He had the right not only to examine the witnesses, but to see into the face of each witness while testifying against 'him, and to hear the testimony given upon the stand. He had the right to see and be seen, hear and be heard, under such reasonable regulations as the law established. By our Constitution it is clearly made manifest that no man shall be tried and condemned in secret, and unheard.' The chief purpose in requiring that the accued shall be confronted with the witnesses against him is 'held to be to secure to the defendant an opportunity for cross-examination; so, that if the

opportunity for cross-examination has been secured, the test
of confrontation is accomplished.   If the confrontation can
be had it should be had.   By taking the testimony of the
witness Johnson in the presence of the accused upon the ex-
amination at a time when he had the privilege of cross-ex-
amination, this constitutional privilege is satisfied, provided
the witness cannot, with due diligence, be found within the
state."

## In 8 R· C. L. 213, § 209, we find the following:

"Generally, the viva voce examination of a witness in the
presence of the party on trial is required, because it is the best
evidence.    The direct and cross-examinations are the best
means of eliciting the whole truth, and the manner of the
witness is one of the tests by which to determine the degree
of credit to which he is entitled; but this is not always at-
tainable, and what a deceased witness, or one who from
other causes has become incapacitated to give evidence, has
sworn on another trial or preliminary examination where the
accused had the opportunity to cross-examine the witness,
is admitted on the principle that it is the best of which the
case admits.    Such testimony is not open to the objections
ordinarily urged against hearsay or derivative evidence, hav-
ing been delivered under the sanction of an oath, and the
adverse party having had the full benefit of a cross-exami-
nation.    It is therefore admitted upon the principle of neces-
sity so as to prevent a defeat of the ends of justice.    There
is doubtless reason for saying that the accused should never
lose the benefit of any of the safeguards thrown around
him, even by the death of the witness, and that, if notes of
his testimony are permitted to be read, he is deprived of the
advantage of that personal presence of the witness before
the jury which the law has designed for his protection.    But
general rules of law of this kind, however beneficent in their
operation and valuable to the accused, must occasionally give
way to considerations of public policy and the necessities of
the case.    The law in its wisdom declares that the rights of
the public shall not be wholly sacrificed in order that an
incidental benefit may be preserved to the accused."

## Again, in volume 10 R. C. L. p. 968, the rule is stated, as follows:

"The constitutional or statutory right of the accused 'to be
confronted by the witnesses against him' is not necessarily
infringed by the admission of former testimony of a witness,
who has since gone beyond the jurisdiction of the trial court,
or has died, or has become incapable of giving his testimony.
* * * The prevailing view is that the right of confrontation
is satisfied, in cases of necessity, if the accused has been
once confronted by the witnes against him in any stage of the
proceedings upon the same accusation, and has had an op-
portunity of a cross-examination, by himself or by counsel,
in his behalf."

In 16 C. J. p. 839, we find the general rule thus stated: .

"Although there is authority to the contrary, the general rule is that, where the testimony of a witness against accused has been taken down in writing by a magistrate or official reporter at a preliminary examination in the presence of accused, who had an opportunity to cross-examine the witness, such testimony is admissible on the trial, where it is shown that the witness cannot be found after diligent inquiry, or is beyond the jurisdiction of the court."

In the case of Territory v. Ayer, 15 N. M. 581, 113 Pac. 604, a question was presented as to the sufficiency of the predicate laid for the introduction of such testimony, and in passing upon that question the territorial court, through Judge Mechem, held:

"There was sufficient evidence of a competent character to satisfy the trial court that the witness Cutter was beyond the reach of process of the court, and there was no error in admitting the record of his testimony at the preliminary hearing, where the appellant had the opportunity and did cross-examine the witness."

We deem it unnecessary to review the authorities further. We have examined the decisions and have reached the conclusion that the appellant was not deprived of his constitutional right of confrontation. It may be said that the great weight of authority sustains the authorities from which we have quoted. In fact, reason and consideration of public policy and necessity all support the holdings to the effect that where an accused has once had the opportunity of meeting the witness face to face, in a lawfully constituted tribunal, where he is given the opportunity of cross-examing the witness, the constitutional provision has been met, and we so hold.

An exhaustive note dealing with this question will be found in 15 A. L. R· beginning at page 495. This note is continued in 21 A. L. R. p. 662·

[3] This brings us to the question raised by the appellant that if the evidence was admissible, the state did not show proper diligence in attempting to have the witness Snyder present at the time and that, therefore, the evidence was improperly received.

As to the diligence used the sheriff of Quay county testified that he received a subpoena for the witness Snyder, as a witness in the case of State v. Jackson, Cosner, and Lewis; that he went to Glenrio, where the witness had been working, and that he sent a man out to inquire for the witness after court was in session. The only information he could receive was that the witness had gone east into Texas. The sheriff then telephoned the sheriff at Amarillo and also wired to Sherman, Tex., where Snyder had some people; that he had made search by phone and otherwise to ascertain the whereabouts of the witness Snyder. From the general search made he was unable to locate the witness. On cross-examination he testified that Snyder had appeared before the grand jury in March preceding the trial in September, and that he was placed under a recognizance bond in the district court, after the indictment had been returned; that he had heard from the witness frequently as being at Glenrio until just before the subpoena was issued. The foregoing is all the testimony concerning the absence of this witness and the reason for his nonproduction by the state.

Under the general rule hereinbefore quoted, it seems necessary that the party seeking to introduce the testimony must make sufficient showing that the witness whose testimony was taken at the preliminary examination cannot, with due diligence, be produced to testify in person.

In the case of Territory v. Ayer, supra, the testimony which the territorial court held was sufficient to permit the introduction of the evidence taken at the preliminary hearing was, in substance, as follows: The witness Davern testified that Cutter, the absent witness, was located in Los Angeles, Cal.; that he left Albuquerque to go there about a year before the trial; that before leaving he stated to Davern that he was going to Los Angeles to take a position as surgeon of a traction company there. On cross-examination Davern testified that all he knew about Cutter leaving was

what Cutter told him and that he had not seen Cutter since he left. The return of the sheriff on the subpoena issued for Cutter was in the following words: "I further certify that Dr. James B. Cutter could not be found in my territory and is now in California." This return was admitted in evidence. This was all the testimony appellant introduced at the trial showing the unavailability of the witness Cutter. The territorial court held that the showing was sufficient.

In Lowe v. State, 86 Ala. 47, 5 South. 435, the absence of the witness from the state was held sufficiently established by testimony showing that the witness had gone to a distant state about two weeks before the trial for an indefinite period.

Sufficient diligence was held to be shown in the case of People v. McIntyre, 127 Cal. 423, 59 Pac. 779, where the officer having the subpoena for the witness testified that after following every clew as to the whereabouts of the witness he was informed by acquaintances of the witness that he had left the state, and it could not be told when he would return, although one person said he was liable to return on business at any time.

In Wilson v. State, 175 Ind. 458, 93 N. E. 609, the predicate was held to be sufficiently laid by proof that the prosecuting attorney and sheriff made diligent effort to locate the witness, all subpoenas being returned "not found," and witnesses likely to know where he was testifying that they did not know.

These are only a few of the many cases which discuss the question of the sufficiency of the predicate. There are found many which hold that the evidence offered was insufficient, but we cannot so hold in this case. In fact, from the record, it appears that the state used every reasonable effort to secure the attendance of the witness Snyder. He was placed under recognizance by the district judge. Subpoenas were issued in due time, and from the testimony of the sheriff it seems apparent the witness had gone

into another jurisdiction and was in fact absent from the state of New Mexico.

In this connection, we want to call attention to the fact that the sufficiency of the showing is a question of fact to be determined by the trial court, and this court will not reverse the trial court's ruling unless it is shown that the lower court abused the discretion vested in it.

"Whether or not it has been satisfactorily shown that a witness whose testimony was taken at the preliminary examination cannot be, with due diligence, found within the state is a question of fact that is presented to the trial court to be determined by it from the evidence introduced before it, and the appellate court will not interfere with the trial court's exercise of discretion, provided it is not abused." People v. Poo On, 49 Cal. App. 219, 192 Pac. 1080.

Certainly it cannot be said in this case that the court abused its discretion in permitting the testimony taken at the preliminary hearing to be used.

[4] 4. Appellant argues that there was not due process of law because, in the record, no verdict of the jury appears. The state and appellant do not agree as to what was called for in the original praecipe, but we do not deem this of importance. In the stenographer's transcript it appears, at page 324, that the jury returned its verdict into open court, to which verdict the defendant, Orin B. Jackson, excepted and gave notice of appeal. At page 328 of the record appears he sentence of the court. From this final judgment this appeal is perfected. At page 329 appears the order granting the appeal. It is not contended by the appellant that the verdict was "not guilty," nor is it contended that the court wrongfully passed sentence upon the verdict, returned. He makes the bare statement that the verdict is not shown in the record. No authorities are cited showing that this is error. Therefore, we will not further consider this assignment.

[5] 5. Appellant next complains that the court erred in overruling an objection to a question pro-

pounded to the witness Fred White. The question is shown at page 96 of the record, and is:

"State whether or not from the examination you made of the character of that soil there, if it was of such a nature that a gun of the kind and character that you saw there would have made an imprint or impression of the ground there, if it had fallen say for a distance of twelve inches?"

The objection to this question was that it called for a conclusion of the witness and assumed a statement of facts not proved by the evidence. The objection on this point is not well taken.

In the case of State v. Pruett, 22 N. M. 223, 160 Pac. 362, L. R. A. 1918A, 656, this court said:

"We do not deem it necessary to go into any extended discussion of the so-called 'opinion rule' of exclusion of testimony. It will be sufficient merely to state the underlying principle by which said rule is applied. That principle is that any person may express an opinion before a jury, upon a nontechnical subject, based upon data which he has observed when it is impossible by word of mouth or gesture to reproduce the data before the jury, so that the jury may intelligently draw the inference therefrom which the witness has drawn."

The witness had been previously interrogated as to the condition of the soil and the position of the gun, and the court was correct in permitting the witness to answer the question.

[6] 6. It appears that the defendant offered to prove that, immediately after the killing, Jack Lewis and Brent Cosner suggested to the appellant, Jackson, that he surrender, and that Jackson said that he would go to the ranch and "wait for the law to come for him; that the boy Snyder had probably seen the whole thing." It was stated by the appellant that the purpose of this offer was to show why he did not go and surrender himself at once and overcome any prejudice against him by reason of the fact that he did not surrender. The court excluded this testimony, and the appellant assigns the court's ruling as error.

State v. Jackson, 30 N. M. 309

In connection with this alleged error, the appellant contends that the state offered a great deal of evidence showing that the defendant, Jackson, after the homicide, went to the Frost camp and later into Texas, thereby inducing the suggestion of concealment and flight. He further says: ''The defendant should be allowed to explain his mental attitude on this subject.'' In support of this, the appellant cites authorities to the general effect that when evidence of flight is introduced, the defendant may explain his motives and reasons for concealment. It it can be said that the state's evidence did show flight on the part of the defendant, it would seem proper to permit the defendant to explain those facts and circumstances which showed, or tended to show, an attempt to escape.

"For it must be remembered that evidence of flight, concealment and other like acts is admitted only because it is generally assumed that such acts indicate consciousness of guilt. Therefore the accused should be permitted to testify directly to his motive at the time of the act charged, and he may relate his state of mind." Wharton's Cr. Evid. (10th Ed.) vol. 2, § 950.

However, the proof offered in this case was not such proof as is contemplated by the foregoing authority. The accused was on the stand testifying. If he had been asked to explain his actions or to testify concerning his motives and reasons for the acts which the appellant says the state claims amounted to flight, doubtless the court would have permitted such explanation. But the offer was not such an explanation. It was the offer of a conversation in which the defendant, who was then on the stand testifying claims he made certain statements.

We do not think that the offer of a conversation is the proper method of proving the matters attempted to be proved in the offer. The defendant was on the the stand, and there was no reason why he should not have testified directly concerning such matters. In fact, he stated why he went to Texas. The question asked at this time gave him full opportunity to explain his reasons, had he so desired. The question was,

"When you found the law had not come for you up
to 5 or 6 o'clock, what was your idea in going to
Texas?" to which he answered, "I told my brother I
would be back· He wanted me to help gather steers,
and we went over there to gather steers." Further, he
explains the facts and circumstances which fully con-
veyed to the jury the thing sought to be conveyed by
the tender in that, in his direct examination, he testi-
fied that on Wednesday following the killing on Sun-
day, he was advised that the sheriff of Quay county
was in Vega, Tex., and, upon learning such fact he,
the defendant, went immediately to Vega, met Mr·
Simpson and returned with him to New Mexico without
requisition. As we stated in the beginning, the con-
versation was not admissible; and finally we find that
the defendant was given full opportunity to explain,
*directly,* what reasons he had, if any, for leaving the
state. Therefore it cannot be said that there was any
error in the court's ruling.

[7] 7. We fail to find any merit in the contention
of the appellant that the court erred in refusing to
give his requested instructions numbered 3, 4, and 5.
So far as the defendant Jackson is concerned, we can-
not see the applicability of the instructions requested.
As abstract propositions of law they may be correct,
but it appears from the instructions given by the court
that the jury was fully advised as to all the issues in
the case. This being true, there was no error in refus-
ing the instructions requested.

[8] 8. In subdivisions 9, 10, and 11 of appellant's
brief, it is argued that there is an entire absence of
motive; that it is lawful to kill in defense of a third
person, particularly a relative; and that no verdict
higher than manslaughter, if even that, is justified
by the testimony.

We cannot agree with the appellant that these ob-
jections are sustained by the record. We have hereto-
fore determined that there was sufficient evidence to
sustain the verdict of murder in the second degree.
This disposes of the matters argued in these three sub-

divisions except possibly that of the tenth, which is argument based upon the proposition that it is lawful to kill in defense of a third person, particularly a relative.

The appellant's argument as to the law in this particular fails to disclose any error, even if his contention is correct. The trial court submitted the defenses raised by defendant's testimony to the jury under proper instruction. The verdict of the jury was against the defendant's version, and that decision is binding on this court. Therefore we need not consider this argument.

9. Appellant seriously contends that the sentence, under all the circumstances, was excessive and an abuse of the discretion imposed in the court by the statute. Necessarily, the appellant admits that the sentence does not exceed the statutory limits, but he argues that there cannot be found in the evidence any justification for a sentence from 90 to 99 years, and that both the jury and the court were affected by prejudice and passion which was not justified by the evidence. In this connection the appellant seeks to invoke the constitutional prohibition against cruel and unusual punishment. This constitutional provision has been before the courts in a great many cases and an interesting question is raised as to whether the constitutional provision is directed to the Legislature or to the courts.

An illuminating opinion dealing with this question will be found in the case of Territory v. Ketchum, 10 N. M. 718, 65 Pac. 169, 55 L. R. A. 90. The opinion was written by Justice Parker, now Chief Justice of this court, and in it he carefully reviews all the authorities to that time. He concludes that the discretion of the Legislature in determining the adequacy of punishment for crime is almost, if not quite, unlimited. However, he does assume, for the sake of argument, that the courts may, in extreme cases, review the discretion of the Legislature in determining the severity of punishment, but he holds that the

statute in question in that case was not unconstitutional, because the penalty inflicted was not cruel or unusual as compared to the gravity of the offense.

In the present case, the appellant does not question the validity of the statute itself, but he does seriously contend and urge that the sentence is excessive and is disproportionate to the offense committed. The sentence imposed was within the limits fixed by statute, and the only question presented by appellant's argument is whether the sentence is disproportionate to the offense committed. We have found the question as to the power of an appellate court to review a sentence which is within the statutory limits an interesting one.

The authorities are not in harmony on this question, and it has been held that a sentence that is within the limits fixed by the statute is valid, no matter how harsh it may be; the reasoning of the courts so holding being that the constitutional interdict has reference to the statute fixing the punishment and does not refer to the sentence assessed by the court, and that any punishment within the statutory limits cannot be held to be excessive. We also find ample authorities holding that an appellate court does have power to review the sentence and to determine whether the lower court has abused the discretion vested in it by the statute.

In 16 C. J. 1362, it is said:

"The statute frequently leaves the extent of the punishment to the discretion of the court within certain limits, and the exercise of such discretion within the limits prescribed by statute will not be interefered with unless it is clearly abused."

In 8 R. C. L. 264, the general rule is thus announced:

"It has been stated as a general rule, in cases where the objection was to the particular sentence, and not to the statute under which it was imposed, that a sentence which is within the limits fixed by statute is not cruel and unusual and is therefore valid, and it has been held that this is true no matter how harsh and sevree it may appear to be in a particular case, because the constitutional prohibition has

reference to the statute fixing the punishment and not to the punishment fixed by the jury or court within the limits fixed by statute. If the statute is not in violation of the Constitution, then any punishment assessed by a court or jury within reason that the power to declare what punishment may be the limits fixed thereby cannot be adjudged excessive, for the reason that the power to declare what punishment may be assessed against those convicted of crime is not a judicial power, but a legislative power, controlled only by the provisions of the Constitution. But where the court on appeal, taking into consideration all of the circumstances surrounding the commission of the crime, determines that the sentence imposed is excessive, it may modify the sentence imposed by the trial court."

If it should be conceded that this court does have power to declare a sentence invalid if it should seem excessive and out of proportion to the offense committed, we do not think it would be necessary or proper in this case to invoke such power. It is said that—

"In order to justify a court in declaring a punishment cruel and unusual with reference to its duration, the punishment must be so disportionate to the offense committed as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances." 8 R. C. L. 266; Fisher v. McDaniel, 9 Wyo. 457, 64 Pac. 1056, 87 Am. St. Rep. 971; Territory v. Ketchum, supra.

This proposition seems to be in harmony with the rulings of all the courts. With this rule in mind, we have reviewed the testimony and are convinced that the circumstances in this particular case fully warranted the sentence imposed. Instead of finding a sentence such as would shock the moral sense of all reasonable men as to what was right and proper under the circumstances, we find one which we believe is fully justified by the evidence. Having arrived at this conclusion, it is unnecessary in this opinion to determine the power of this court to review the action of the lower court and say whether the sentence passed does abuse the discretion vested in the lower court by the statute. It being conceded that the statute does not violate the constitutional provision, and we, having determined that the facts proved justify the court in imposing the sentence of not less than 90 nor more than 99 years, anything further is unnecessary to this

decision. For the reasons stated, there is no merit in appellant's contention in regard to the sentence passed.

10. Appellant's contention that the court committed error in giving its instruction numbered 22 cannot be sustained· This is the ordinary form of instruction given in cases where self-defense is interposed, and has often been approved by this court. The facts proved fully warrant the instructions.

11· In the thirteenth assignment the appellant contends that there was no competent proof of the identify of the cause heard before the committing magistrate, before which the testimony of the witness Snyder was alleged to have been given, as a basis for its admission at the trial. At page 43 of the record, in the direct examination of the witness John Grayson, the following appears:

"Q. Are you acquainted with one D. L. Snyder, or Dave Snyder? A. Yes, sir.

"Q. You may state whether or not a preliminary hearing was held before you on the 17th day of October, last year? A. Well, it was about that time. I don't exactly remember the date at this time.

"Q. That was the case in which the state of New Mexico charged these defendants with killing and murdering one Royal W. Lackey on the 2d day of October, 1921? (Mr. Renehan: Objected to for the reason that it calls for a conclusion of the witness and is not the best evidence. The Court: Overruled. Mr. Renehan: Exception.) A. It was."

The foregoing shows that the cause heard before the committing magistrate was the case in which the state of New Mexico charged the defendants, Jackson, Cosher, and Lewis, with killing and murdering one Royal W. Lackey, on the 2d day of October, 1921. We consider that the proof offered was competent and the objection made by counsel was properly overruled. Inasmuch as it was for this same offense that the defendants were tried in the district court and from the conviction of the defendant Jackson this appeal is perfected, we ·deem the identification sufficient.

12. The last assignment made by the appellant is that the verdict was contrary to the law and contrary to the evidence. It is a conclusion from the other assignments, and, as it presents no new matters, there is nothing to be considered.

We have carefully considered all the points presented by the appellant. We have reviewed the entire record and find no error. The judgment of the lower court will therefore be affirmed; and it is so ordered.

PARKER, C. J., and BOTTS, J., concur.