564 P.2d 1329
STATE of New Mexico,
Plaintiff-Appellee,

v.

Jackie SLAYTON, Defendant-Appellant.

No. 2775.

Court of Appeals of New Mexico.

May 10, 1977.

Leon Taylor, Albuquerque, Lynn Pickard, Sarah M. Singleton, Pickard & Singleton, Santa Fe, for defendant-appellant.

Toney Anaya, Atty. Gen., Donald D. Montoya, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

OPINION

WOOD, Chief Judge.

Defendant was convicted of second degree murder. We summarily reversed the conviction by memorandum decision in *State v. Slayton,* (Ct.App.) No. 2584, decided July 20, 1976. We reversed because the showing before this Court was that an arrangement between counsel for defendant and the prosecutor prevented the defendant from having a meaningful trial. See *State v. Romero,* 86 N.M. 244, 522 P.2d 579 (1974).

After the reversal by this Court, defendant was given a new trial. A witness who testified at the first trial died prior to the new trial. At the new trial, over defendant's objection, the State introduced the testimony given at the first trial by the deceased witness. Defendant has again been convicted of second degree murder. We again reverse. In doing so we consider only one of the issues presented by defendant. That issue, which is dispositive, is the fairness of using the testimony of a deceased witness given at a trial conducted by counsel pursuant to an arrangement between counsel which deprived the trial of meaning.

Having reviewed (a) the proceedings at the first trial, (b) the showing before this Court in connection with the appeal from the first conviction, and (c) the showing made at the evidentiary hearing prior to the new trial which sought to suppress the deceased witness's prior testimony, we

agree with the defendant. " . . . [T]he role the State played in depriving defendant of a fair trial at the first trial bars admission" of the testimony of the deceased witness. See *State v. Halsey,* 34 N.M. 223, 279 P. 945 (1929); *State v. Plant,* 86 N.M. 2, 518 P.2d 961 (Ct.App.1973).

What was the role played by the State?

The showing to this Court in the first appeal was that Solsbery, the defense attorney, had represented defendant's father in civil matters for at least fifteen years. After the killing, the father contacted Solsbery, who in turn contacted District Attorney Cathey and informed Cathey that defendant was undergoing psychiatric evaluation at a hospital in Dallas, Texas.

On April 17, 1976, Solsbery and Cathey took the deposition of the psychiatrist. After the deposition, Cathey agreed with Solsbery that defendant was insane. Cathey supplied Solsbery with a form of judgment used in another case in which the defendant was found not guilty by reason of insanity at the time of commission of the offense. Cathey advised Solsbery that Cathey was agreeable to entry of a similar judgment in defendant's case.

Solsbery and the father had discussed employing an attorney experienced in criminal law. After the April 17th agreement nothing was done about such a lawyer. In light of the agreement it was not necessary.

Three times subsequent to April 17, 1976, Cathey assured Solsbery that a judgment of insanity would be entered. 1. In early May, 1976 Cathey advised Solsbery by telephone that Cathey had discussed the case with Judge Snead and Judge Snead was agreeable to a judgment along the lines Solsbery and Cathey had discussed. (We interject that the record does not show Judge Snead agreed to anything; our concern is with Cathey's representation that Judge Snead had agreed to an insanity judgment.) 2. On May 13 or 14, 1976 after an informal pretrial conference before Judge Snead, Cathey told Solsbery not to worry, that Judge Snead would sign the proposed judgment. 3. On May 20, 1976 Cathey advised Solsbery that because of political commitments, Cathey would not appear for the hearing scheduled on May 21, 1976. Solsbery was advised that Assistant District Attorney Stagner would appear. However, " 'the name of the game is still the same' ".

Various exhibits supported the credibility of the above information which was presented to this Court by affidavit. One exhibit was the form of judgment supplied by Cathey, another was the form of judgment that Solsbery prepared, still another was an "outline" of the procedure Solsbery was to follow on May 21, 1976. Because of Solsbery's lack of recent experience in the criminal law, Solsbery obtained the assistance of attorney Fleming in preparing the outline. The outline listed various rights that were to be waived. The outline was shown to Stagner prior to the hearing. Stagner advised that arraignment could not be waived; Solsbery crossed off of the outline the notation to waive arraignment.

The first trial was on May 21, 1976. Judge Snead rejected the insanity defense and found defendant guilty. Defendant moved for a new trial, relying on the matters discussed above. Asserting that an agreed judgment was to be entered, defendant claimed he had been denied a fair trial because the agreement had not been kept. Although Cathey filed a written "consent" to a new trial, the motion was denied.

On the basis of the foregoing, this Court proposed summary reversal. The State filed a memorandum opposing summary reversal, contending we should not reverse before examining the record of proceedings before the trial court. However, the State did *not* contest the accuracy of any of the factual representations made to this Court. Accordingly, we summarily reversed. After the reversal, Judge Snead granted a new trial and recused himself.

Judge Reese was the judge for the new trial. Defendant moved to suppress use, at the new trial, of the testimony given by the deceased witness at the first trial. An evidentiary hearing was held; both Solsbery and Cathey testified.

Solsbery's testimony is entirely consistent with his affidavit to this Court. The evidentiary hearing developed additional information. The deposition of the deceased witness was taken on April 19, 1976. Solsbery neither prepared for the deposition nor cross-examined the witness. He did not do so because of the agreement with Cathey. The form of judgment which Solsbery prepared contained a provision that defendant would remain out of the state for a year. According to Solsbery, Cathey stated the provision "would take some of the heat off of him." Solsbery testified that after April 17, 1976 he engaged in no trial preparation and interviewed no witnesses. When Solsbery went to court on May 21, 1976, he went with the understanding that the only issue to be tried was defendant's sanity at the time of commission of the offense. Consistent with that understanding the only defense evidence at trial was the father's testimony and the deposition of the psychiatrist. Both went to the insanity defense.

Cathey's testimony varies somewhat from that of Solsbery. Cathey would not characterize his understanding with Solsbery as an agreement that a judgment of insanity would be entered. Cathey admitted that he thought Judge Snead would find defendant insane and admitted he would not have opposed such a judgment. Cathey agreed that he handed over the form of judgment which Solsbery used, but disagreed as to the reason he supplied the form. Cathey affirmed that after contacting Judge Snead in early May, 1976, he had the impression that Judge Snead would find defendant not guilty by reason of insanity but admitted that Judge Snead never made such a statement. Cathey failed to answer when asked whether, in early May, 1976, he advised Solsbery that Judge Snead would sign the proposed judgment. Cathey could not remember whether he assured Solsbery after the pretrial conference that Judge Snead would sign the proposed judgment. Cathey could not remember what he told Solsbery on May 20, 1976.

Cathey agreed that he was not to put on any expert testimony at the trial on May 21, 1976 and in fact did not. Cathey could not remember whether Solsbery told him that Solsbery would only prepare on the insanity issue. Cathey admitted he was shocked when Judge Snead rejected the insanity defense and found defendant guilty.

Although Cathey and Solsbery disagree as to an "agreed" judgment, the showing was uncontradicted that both counsel proceeded on the basis that a judgment of insanity would be entered and that counsel cooperated in the preparation of the judgment. It is uncontradicted that Solsbery did nothing toward preparing a defense. Cathey did not contradict Solsbery's testimony that after April 17, 1976 Cathey assured Solsbery three times that an insanity judgment would be entered.

Does the record of the trial on May 21, 1976 cast a different light on the dealings between Solsbery and Cathey? No. The State called ten witnesses; Solsbery did not cross-examine six of them. Cross-examination of one witness went only to the type of pickup truck in which a shell was found. Cross-examination of another witness brought out that on the evening prior to the killing the defendant was "irrational". Cross-examination of still another witness brought out that defendant and the deceased had a fight during the evening before the killing and the deceased got the best of the fight.

The most extensive cross-examination was of the deceased witness. This examination touches on a variety of topics—defendant's drinking, his fight with the deceased, defendant's temper, the State's grant of immunity to this witness, the witness's memory problems. Although various topics were touched on, none were developed. The cross-examination at best was cursory and consistent with Solsbery's asserted role-playing prior to a judgment finding defendant insane at the time of the offense.

N.M.Const., Art. II, § 18 states that no person shall be deprived of liberty without due process of law. Use of the deceased witness's first trial testimony at the new

trial violated this constitutional provision. The violation is established by the uncontradicted showing that at the first trial counsel proceeded under an arrangement which considered only the question of defendant's sanity, an arrangement that gave no consideration to defendant's guilt or innocence. To use the deceased witness's testimony concerning guilt would be fundamentally unfair because under the arrangement between counsel there was to be no meaningful inquiry concerning guilt. Such fundamental unfairness violates due process.

The conviction and sentence are reversed. The cause is remanded for a new trial. At this new trial, neither the deposition of the deceased witness nor the deceased's testimony is to be admitted as evidence.

IT IS SO ORDERED

HENDLEY, J., concurs.

SUTIN, J., specially concurs.

SUTIN, Judge (specially concurring).

*I concur in the result.*

Judge Wood's opinion reads like a Sherlock Holmes detective story in which an alleged murderer gets relief from a second degree murder conviction. The opinion is not based upon the claims of error raised by defendant on this appeal. Its conclusion arises out of righteous indignation, a strong feeling that results from a review of the mechanical formula that led to the conviction of defendant in the first and second trials. My feelings are also strong for reversal. My reasons differ.

"The process of judging, so the psychologists tell us, seldom begins with a premise from which a conclusion is subsequently worked out. Judging begins rather the other way around—with a conclusion more or less vaguely formed; a man ordinarily starts with such a conclusion and afterwards tries to find premises which will substantiate it. A convenient analogy is the technique of the author of a detective story." Frank, Law and the Modern Mind, p. 100 (1936).

Those of us who have had long experience in the courtroom and ascend to the appellate court view the record below with a laser beam to detect the fairness or unfairness of a criminal trial. We perceive with the retina, not with a dictionary. We should not flyspeck in our examination of what goes on before and during trial. However, in our effort to see that the rights of persons accused of crime are protected, we should not overlook the fact that the people also have interests that should be protected. We must weigh in the balance the correlative rights of the defendant and the public.

This detective story began on January 21, 1976, in Roswell, New Mexico, when defendant allegedly shot and killed the deceased. For emergency reasons, A. D. Solsbery, an oil and gas lawyer, was employed to represent defendant prior to a criminal information being filed. The district attorney knew that Solsbery was not learned in criminal law and was not able to represent defendant in a criminal trial.

On April 1, 1976, the district attorney prepared a criminal information that accused defendant of first degree murder. The information was filed April 13, 1976. The district attorney accompanied Solsbery to Dallas, Texas, to take the deposition of Dr. Kindred, defendant's attending psychiatrist. It was taken on April 17, 1976. Thereafter, the district attorney and Solsbery agreed that defendant was not guilty by reason of insanity and a formal order was prepared to submit to the trial court.

On May 21, 1976, a hearing was held before the trial court. For some petty reason, the district attorney did not appear. He sent his assistant. The sole issue in the case was intended to be the mental competence of defendant, together with an order approved by the district attorney, that defendant was not guilty by reason of insanity. The district attorney told Solsbery he had conferred with the trial court on this matter. However, the district attorney failed to notify the trial court of this agreed arrangement.

Defendant was arraigned and pled not guilty, and not guilty by reason of insanity. A preliminary hearing and trial by jury were waived. Solsbery advised the court of defendant's evidence on the issue of insanity, and said " . . . in this connection, your honor, we would waive any hearing which would be necessary to determine the Defendant's sanity to understand the nature of these proceedings." The court said: "All right. I take it then, there is no issue for the Court, concerning his present capacity to stand trial."

*Lo and behold* ! The court called the case for trial on first degree murder! Solsbery was not prepared to meet the challenge of a trial.

The State called as a witness Mike Hutchinson, 23 years of age.

At this "trial," Hutchinson testified that he had known defendant some seven or eight years before the alleged crime and had worked with him in the same employment. On the day of the alleged crime, he was with defendant in a bar and witnessed an arm wrestling match between defendant and the deceased. Defendant and Mike left the bar in defendant's pickup. Defendant got a shotgun and some shells, went back to the bar and waited for the deceased. Deceased left the bar, got into his car and drove to the south part of Roswell and stopped. Defendant and Hutchinson followed the deceased and when the deceased got out of his car, defendant shot him three times. This was the only direct evidence against defendant.

How strange that, at an agreed arrangement for a hearing before the court on defendant's mental competency, testimony of first degree murder was presented and defendant was convicted of second degree murder!

Hutchinson's testimony did not bear upon defendant's mental competency at the time of the alleged offense. However, the district attorney sought a conviction of defendant for first degree murder by any means at an agreed arrangement for an order of not guilty by reason of insanity. This was fundamental injustice and we rec-

ognized it. Not only did the district attorney fail in his duties as a representative of the public, but he knew that defendant was without adequate representation at a trial for first degree murder.

Defendant appealed to this Court. Defendant claimed fundamental error because (1) defendant was deprived of a fair, meaningful trial; (2) that the trial court did not make a valid determination of defendant's competency to stand trial; (3) that defendant did not make an intelligent and express waiver of jury trial; (4) that defendant's counsel was rendered ineffective by the negotiations and representations made; (5) that the trial court's decision on defendant's sanity was not supported by substantial evidence.

We proposed summary reversal. The State submitted a memorandum in opposition to summary reversal of no value and in a three-sentence Memorandum; we reversed. The trial judge recused himself and the second trial took place before a new judge and a jury.

Unfortunately, we did not meet the challenge of the first appeal. We did not write an opinion in which we could have determined the admissibility of Hutchinson's testimony on retrial. *In hasty decisions,* we often overlook matters of substance and create insuperable barriers to fairness and justice. We are often reversed by the Supreme Court. If we had met the challenge, defendant's second appeal might have been avoided.

On August 22, 1976, Hutchinson committed suicide. At the second trial, Hutchinson's prior testimony was used, over objections, to convict defendant of second degree murder. If this testimony were not used, defendant's conviction would have depended on circumstantial evidence. By denying the use of Hutchinson's prior testimony, we do not set the defendant free. We do place an additional burden on the district attorney to establish defendant's guilt beyond a reasonable doubt. The defense relies on an alibi that defendant was at home at the time of the alleged crime.

On this appeal, defendant raised two points.

(1) That the admission at the second trial of Hutchinson's testimony violated hearsay rules and the right of confrontation. This point is questionable.

(2) The conduct of the district attorney at the second trial deprived defendant of a fair trial. This point is superfluous.

At the second trial, defendant did not raise an issue that constitutional due process was violated. We must search for our own concepts of the law to determine the admissibility of Hutchinson's testimony.

Alfred the Great, King of Wessex, successfully resisted the Danish invaders after watching the spider weave its cobweb to an end. Judge Wood's opinion, like a spider, wove a cobweb to an end in the second trial by resorting to the mechanics of the first trial. Does it successfully resist the demands of the State and the public? Yes, but for reasons stated without authority to support it.

"Courts of review are dedicated to the protection of the constitution and devoted to the principle that 'Justice, Justice shalt thou pursue.' This court has the inherent power to prevent, fundamental injustice." *Saiz v. City of Albuquerque,* 82 N.M. 746, 749, 487 P.2d 174, 177 (Ct.App.1971) (Sutin, J., dissenting), overruled in *Galvan v. City of Albuquerque,* 87 N.M. 235, 531 P.2d 1208 (1975). "Ordinarily this court is content to examine the points here relied upon for reversal, if properly preserved at the trial, sustaining or overruling them. That is all appellants are entitled to as of right. But that does not limit the inherent power of this court to prevent fundamental injustice." *Gonzales v. Rivera,* 37 N.M. 562, 568–69, 25 P.2d 802, 805 (1933).

Fundamental injustice depends upon what the court believes its concept of justice to be. Justice does not mean "hang in haste and try at leisure". It means to be fair, to do the right thing, to shoot straight with the defendant; to give the Devil his due; to see justice done. "The time has

come once again to remind each district attorney that he has a duty, not to seek conviction alone by any means. He has a duty to give the defendant a fair trial. Trial judges have the same duty." *State v. Quintana,* 86 N.M. 666, 673, 526 P.2d 808, 815 (Ct.App.1974) (Sutin, J., concurring in part and dissenting in part).

It is upon this basis that we must determine the admissibility of Hutchinson's testimony. We must recognize the general rule that former testimony of a witness is admissible where the witness testified at the former trial, was *fully examined and cross-examined,* and then died. Defendant was actually confronted with the witness in the first trial and cannot complain. *Mattox v. United States,* 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895); *State v. Tijerina,* 84 N.M. 432, 504 P.2d 642 (Ct.App.1972), opinion of Hernandez, J., adopted by the Supreme Court in *State v. Tijerina,* 86 N.M. 31, 519 P.2d 127 (1973); *State v. Moore,* 40 N.M. 344, 59 P.2d 902 (1936); *State v. Jackson,* 30 N.M. 309, 233 P. 49 (1925). We have gone so far as to hold that where objections were not made to the admissibility of the evidence in the former trial, the defendant is precluded from further objections as to its admissibility. *State v. White,* 61 N.M. 109, 295 P.2d 1019 (1956).

If we were to follow these rules of law, Hutchinson's testimony was admissible and we should affirm the conviction below.

Defendant seeks to avoid these rules of law by reference to Rule 804(b)(1) [§ 20–4–804(b)(1), N.M.S.A.1953 (Repl.Vol. 4, amended in Interim Supp.1976)]. This rule provides that where a witness is unavailable, his former testimony is admissible as an exception to the hearsay rule:

. . . [I]f the party against whom the testimony is now offered . . . had an opportunity *and similar motive* to develop the testimony by . . . *cross . . . examination.* (Emphasis added)

Under this rule defendant's motive to develop testimony by cross-examination in the first trial must be similar to that motive in the second trial.

Defendant says "To be sure in the case at bar, the cause of action was the same in both cases." With this admission, the issues in both cases were the same. The motive would ordinarily be the same. But, defendant at the first trial sought only to substantiate his plea of not guilty by reason of insanity. Perhaps he had no motive to cross-examine the substance and credibility of Hutchinson's testimony. Perhaps the issues were not the same under the erroneous belief that insanity was the only issue and that a finding of insanity was assured defendant. There may be some merit to defendant's contention. But even if the contention is correct, defendant's attorney, an oil and gas lawyer, under the circumstances of this case, had no motive in cross-examination at the first trial.

In order to deny the admissibility of Hutchinson's testimony at the second trial, we must find some constitutional bases upon which to declare fundamental error or, a miscarriage of justice, or we must find that the trial court abused its discretion.

A hearing on defendant's motion to suppress Hutchinson's testimony was held before the second trial at which Solsbery and the district attorney testified. The trial court should have learned that defendant and his attorney were misled by the district attorney at the former trial; that it was a simulated trial; that defendant's attorney was not prepared to assist defendant; and that the defendant did not have adequate assistance of counsel. This is obvious. Preliminary examination and jury trial were waived by defendant. Hutchinson was not fully cross-examined. Objections were not made to Hutchinson's testimony, nor motions made to strike his testimony. Defendant and his attorney did not prepare for trial for first degree murder, and they were not, in effect, prepared. They were led to the precipice of a lofty mountain blindfolded, and the district attorney allowed defendant to step off to years of imprisonment, and allowed his attorney to have a conniption. The proceedings were so abhorrent that we granted a summary reversal after the first trial. The trial court, however, denied defendant's motion to suppress the testimony of Hutchinson.

Based upon the oral arguments made and briefs filed, I can recognize the reasons that led the trial court to deny defendant's motion. Generally speaking, former testimony of a deceased witness is admissible in a subsequent trial, so that hearsay rules and right of confrontation did not affect the thinking of the court.

In my opinion, defendant appeared without counsel at the first trial. Inexperienced attorneys in criminal trial practice are not *effective* legal defense counsel. Oil and gas attorneys are not *effective* criminal lawyers. Negligence trial attorneys are not *effective* tax attorneys. Commercial attorneys are not *effective* trial counsel.

The people of New Mexico adopted our Constitution. The people gave to defendants certain constitutional rights called the "Bill of Rights." A repetition of this "Bill of Rights" is unnecessary. The people of our country adopted a Constitution of the United States that contains amendments as the "Bill of Rights." The Constitution guarantees to persons accused of crime the right to jury trial with the assistance of competent counsel for his defense. These are safeguards against the corrupt or overzealous prosecutor, and against a biased or eccentric judge. *The assistance of competent counsel is a requisite to the very existence of a fair trial, Argersinger v. Hamlin, Sheriff,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), and "defendants facing felony charges are entitled to the *effective* assistance of *competent* counsel." (Emphasis added.) *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970).

On grounds of constitutional protection granted by the people, fundamental error occurred, and when coupled with an abuse of discretion, Hutchinson's testimony was inadmissible in the second trial. It was a miscarriage of justice.